UNITED STATES FEDERAL DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| | : | |
| LOLA'S RENDEVOUS, INC. f/k/a | : | |
| SILHOUETTES; MIAMI EMPLOYMENT | : | |
| INC.; THE PINK BUILDING, INC.; | : | |
| STEVEN MEDEIROS, and SHAY DIPINA | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | C.A. No.: |
| | : | |
| PROVIDENCE POLICE DEPARTMENT; | : | |
| THE CITY OF PROVIDENCE; and | : | |
| PROVIDENCE BOARD OF LICENSES | : | |
| *Defendants.* | : | |
| | : | |

## COMPLAINT

Plaintiffs herein are the purveyors of an adult entertainment establishment which caters to members of the African American community. Since Plaintiffs commenced their business operations, they and their patrons have been unlawfully discriminated against by Defendants herein, ultimately leading to the closure of their business. Plaintiffs hereby allege as follows:

### *The Parties*

1.      Plaintiff, Lola's Rendezvous, Inc. f/k/a Silhouettes ("Lola's"), is a Rhode Island corporation, with a principal place of business in Providence, Rhode Island.

2.      Plaintiff, Miami Employment Inc. ("Miami Employment"), is a Rhode Island corporation, with a principal place of business in Providence, Rhode Island.

3.      Plaintiff, The Pink Building, Inc. ("Pink Building"), is a Rhode Island corporation, with a principal place of business in Providence, Rhode Island.

4.      Plaintiff, Shay DiPina is an individual having an address at 942 Mineral Spring Avenue, North Providence, RI. At all times material hereto, Mr. DiPina was the manager of Lola's.

5.      Plaintiff, Steven Medeiros is an individual having an address at 385 Westminster Street, Providence, RI.  At all times material hereto, Mr. Medeiros was the owner of Lola's.

6.      Defendant, City of Providence is a municipality in the State of Rhode Island.

7.      Defendant, Providence Police Department ("PPD") is a department within the City of Providence, which is responsible for the enforcement of ordinances enacted in the City of Providence.

8.      Defendant Providence Board of Licenses is responsible for enforcing ordinances, for levying fines for violations of the ordinances, and for issuing, suspending, and revoking various business and liquor licenses.

### *Jurisdiction and Venue*

9.      This action arises under and pursuant to the First and Fourteenth Amendments to the Constitution of the United States of America; 42 U.S.C. § 1983; and the Constitution and laws of the State of Rhode Island.

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367.

11.     This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) to redress deprivations "under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States."

12.     Venue is proper in this district under 28 U.S.C. § 1391(b).

### *General Factual Allegations*

13.     Pink Building owns the real property located at 245 Allens Avenue (the "Property").

14.    Pink Building leases the Property to Lola's where Lola's operates the adult entertainment club known as "Silhouettes."

15.    Lola's holds several licenses issued by the City of Providence Board of Licenses (among other agencies) including, but not limited to, the following: BV, N, and BX beverage licenses, an adult entertainment license, food business license, sales tax permits, etc.

16.    All of the liquor sales at Silhouettes are owned by Lola's.

17.    Miami Employment operates all other aspects of the business known as Silhouettes.

18.    Silhouettes opened for operations on or about March 4, 2021.  Silhouettes was well known in the local community as the entertainment establishment catering to a predominantly African American crowd.

19.    Silhouettes was also an African American managed establishment.

20.    On March 6, 2021, two nights after opening, Detectives of the PPD entered the establishment, *inter alia*, to investigate Silhouettes' compliance with State-mandated COVID-19 regulations.  At the time of their arrival, the capacity inside the establishment was at 88 people.

21.    Pursuant to the COVID-19 restrictions in place at the time, Silhouettes was permitted to have either 140 (restaurant) or 125 (venue of assembly) people in the establishment.

22.    Despite the fact that Silhouettes was well below the required capacity limit, Detectives of the PPD directed off-duty detail police officers to make sure that no additional customers were allowed inside the establishment.

23.    Immediately after this interaction on March 6, 2021, Mr. DiPina contacted a high-ranking officer within the PPD to discuss what had just transpired.

3

24.     By the next morning, discussions were being had within the PPD that Mr. DiPina had the audacity to make that phone call, that he's "a bad guy," and other officers remarking that "they would get" Mr. DiPina.

25.     On March 27, 2021, the PPD arrived at the Property around 12:45 a.m., and at that time there were 121 people inside of the establishment.

26.     The Providence Police advised that only four more people could enter the establishment, despite the fact that Executive Order 21-26 – the applicable executive order in effect at the time – allowed 175 people to be inside the establishment.

27.     The PPD failed to adhere to the proper, legal capacity limit, went beyond their scope of authority, and directed Silhouettes to shut its doors for the evening despite over fifty (50) patrons waiting in line to enter, and Silhouettes being under the capacity limit.

28.     On March 31, 2021, Plaintiffs' counsel issued a cease and demand letter to the PPD, advising the PPD that its activities were in violation of the Equal Protection Clause of the Fourteenth Amendment for their disparate treatment and discrimination against Silhouettes and its patrons.

29.     Defendants' unlawful activity stopped for several months after the cease and desist letter was issued.

30.     From the time Silhouettes opened through June of 2021, Silhouettes was requesting and paying for police details on the weekend evenings from the hours of 10:30 p.m. to 2:30 a.m.

31.     On May 22, 2021, one of the two police detail officers stationed at Silhouettes on that evening got into a verbal disagreement with Mr. DiPina.  At 2:05 a.m. the officer entered the establishment demanding that Mr. DiPina sign his detail slip/receipt.

32.     Mr. DiPina kindly requested that the officer return to him at 2:30 a.m. when the detail shift ended.  When the officer returned to Mr. DiPina, the officer had added an additional hour of time to his slip.  Mr. DiPina refused to pay for the extra hour, and lodged a complaint with the PPD.

33.     Silhouettes continued to receive the requested details until June 25, 2021.  On that evening when a detail was requested and expected, a PPD patrolman presented at Silhouettes to advise Mr. DiPina that Silhouettes would not be receiving a detail that night.

34.     Thereafter, Silhouettes continued to issue weekly written requests for police details, however no details were acknowledged or provided by the PPD.

35.     Commencing in August 2021, Defendants implemented a new strategy to intentionally interfere with Plaintiffs' business and began stationing marked and unmarked patrol cars directly outside of the Property.  This occurred despite the fact that Plaintiffs had repeatedly requested that PPD provide police details at the entrance of the establishment, and those requests had repeatedly been denied with the PPD citing staffing concerns.

36.     From August 2021 to October 2022, there have been over thirty (30) documented instances of the PPD placing marked cars on Plaintiff's private property, being present inside of the establishment taking pictures and videos with flashlights, and illegally and unconstitutionally stopping and frisking patrons in the parking lot of the Property simply for walking to or from the establishment.

37.     Upon information and belief, the PPD were at all times material hereto aware that Silhouettes' customer base consisted mostly of African Americans and other members of minority ethnicity.

38. During the time period between August 2021 through October 2022, the PPD consistently racially profiled customers of Silhouettes, and repeatedly pulled over automobiles driving in and out of the parking lot outside of the establishment, for no reason other than the fact that the passengers in these automobiles were entering/exiting Silhouettes.

39. Silhouettes' surveillance system shows the PPD conducting multiple illegal and unconstitutional searches of automobiles in the facility's parking lot or on the street immediately outside the facility's front door. Those illegal and unconstitutional searches resulted in no arrests.

40. Upon information and belief, the PPD intentionally and strategically carried out public displays similar to and including those described above between the hours of 12:00 a.m. and 1:00 a.m. PPD knew that was the time most customers/patrons would visit Silhouettes.

41. Upon information and belief, the PPD had full knowledge that such a search on a vehicle immediately outside of the establishment would serve to scare patrons away from Silhouettes, thus intentionally damaging Silhouettes' business.

42. Additionally, on May 14, 2022, Silhouettes was scheduled to host a performance by a New York-based rapper known as "Rowdy Rebel."

43. Just prior to the scheduled date of the Rowdy Rebel performance, Silhouettes was summoned to a conference before the Providence Board of Licenses on May 12, 2022, to respond to anonymous complaints that Silhouettes did not have a performance license for Rowdy Rebel's visit.

44. On May 12, 2022, Mr. DiPina appeared before the Providence Board of Licenses ("Board") with an application for an entertainment license for May 14, 2022, however the entertainment license was denied.

45.     Mr. DiPina represented to the Board that several other establishments in the City of Providence host performances without seeking an entertainment license; specifically, Studio Lounge, among many others.  Mr. DiPina indicated that if the requirement was going to be arbitrarily and selectively applied to him and Silhouettes, it had to be applied to all Providence businesses.

46.     Silhouettes and the Providence Board of Licenses agreed that there would be no live musical performance, and further that there was no prohibition on Rowdy Rebel being present at the establishment on the night in question.

47.     The next evening, May 13, 2022, Silhouettes' house DJ, Pretty Lou, was scheduled to provide the music during the evening.  This type of performance does not require a separate entertainment license through the City of Providence.

48.     At approximately 10:00 p.m. that evening, a Providence Detective and two patrol officers appeared at Silhouettes, and with no notice to anyone took it upon themselves to commence restricting entry into the establishment.

49.     Mr. DiPina then spoke with the Detective.  Mr. DiPina saw that the Detective was holding a pre-drafted "closure notice" in his hand, and it was apparent to Mr. DiPina that the PPD intended to shut the establishment's doors for the evening without cause or explanation.

50.     Mr. DiPina advised the Detective that Pretty Lou was not present in the club that evening, and the Detective placed the "closure notice" back into his pocket.

51.     The Detective remarked to Mr. DiPina that "if Pretty Lou was here, I was shutting you down for the night."

52.    On May 14, 2022, less than fifteen (15) minutes after Rowdy Rebel arrived at the establishment, numerous Providence Police officers presented inside of the club with full cameras and lights, and forced Silhouettes to cease operations for the evening.

53.    At all times material hereto, Defendants' disparate treatment and intentional interference with Plaintiffs' business activities have been motivated by Plaintiffs' business appealing to the African American community.  Silhouettes is known in and around Providence as the establishment centered on African American clientele.

54.    There is no other adult establishment within the City of Providence that is victim to the overzealous attention that Silhouettes receives from the PPD.

55.    Upon information and belief, the PPD is well aware of the power of social media and intentionally place large police presences around Silhouettes with full knowledge of those displays being disseminated on social media thus driving clientele away from Silhouettes.

56.    The PPD, with absolutely no cause, have intentionally created an uninviting environment at Silhouette's property in order to intentionally drive business away and cause damage to Plaintiffs.

57.    The PPD has repeatedly caused disturbances in the form of illegal searches outside of the club at key business hours, with full knowledge that potential patrons/customers would not stop at the establishment when seeing squad cars and police officers searching a vehicle right outside of the front door.

58.    The PPD has utilized these tactics to oppress and disrupt Silhouette's business to intentionally cause damage to the Plaintiffs herein.

59.    This disparate treatment of Silhouettes which is founded on illegally discriminatory practices has caused significant damage to Plaintiffs in the form of decreased business revenues, diminution of property value, and being the direct cause of the closure of Silhouettes.

## <u>COUNT I</u>

### <u>Defendants' Targeted Enforcement of Ordinances Against Plaintiffs Violates Plaintiffs' First Amendment Rights As Applied to the States and Local Governments Through the Due Process Clause of the Fourteenth Amendment.</u>

60.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 59 as if set forth in full herein.

61.    The First Amendment to the United States Constitution provides: "Congress shall make no law…abridging the freedom of speech." The First Amendment's free speech guarantees apply to the City as a political subdivision of the State of Rhode Island by incorporation through the Fourteenth Amendment to the United States Constitution.  The Defendants' targeted enforcement actions against Plaintiffs, as purveyors of an adult entertainment establishment featuring exotic dancing performances – a constitutionally protected activity – cannot be justified under the Supreme Court's freedom of artistic expression jurisprudence, and thus violates the First and Fourteenth Amendments to the United States Constitution, both facially and as applied to Plaintiffs.

62.    Plaintiffs have suffered significant harm as a result of Defendants' actions, said actions having been carried out with the explicit intent to force Plaintiffs out of business without the legal authority to do so.

63.    Accordingly, Plaintiffs respectfully request that the Court declare that the Defendants' actions violate the First Amendment, and award damages to Plaintiffs in an amount to be proven at trial in excess of $10,000,000.00.

## COUNT II

### Defendants' Targeted and Selective Enforcement Activity Against Plaintiffs Deprives Plaintiffs of Their Civil Rights in Violation of 42 U.S.C. § 1983

64.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 63 as if set forth in full herein.

65.     By undertaking meritless enforcement activity against Plaintiffs, Defendants have unlawfully and substantially deprived Plaintiffs of rights secured by the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

66.     Defendants are "persons" under 42 U.S.C. § 1983 who have acted under color of state law to deprive Plaintiffs of rights secured by the United States Constitution and federal law.

67.     Plaintiffs have suffered significant harm as a result of Defendants' actions, said actions having been carried out with the explicit intent to force Plaintiffs out of business without the legal authority to do so.

68.     Accordingly, Plaintiffs respectfully request that the Court declare that Defendants' actions have deprived Plaintiffs of their civil rights secured by the First and Fourteenth Amendments and 42 U.S.C. § 1983, and award damages to Plaintiffs in an amount to be proven at trial in excess of $10,000,000.00.

## COUNT III

### Defendants' Actions Violate the Rhode Island Constitution

69.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 68 as if set forth in full herein.

70.     Business licensing is a matter of statewide concern committed to the exclusive legislative authority of the General Assembly by the Home Rule Amendment to the Rhode Island Constitution. *Newport Amusement Company, Inc. v. Maher*, 166 A.2d 216, 218 (1960).

10

71.     Rhode Island has not delegated authority to the municipalities to engage in extrajudicial, targeted and selective enforcement of local licensing ordinances.

72.     Defendants' egregious actions against Plaintiffs interferes with the Rhode Island Constitution's allocation of powers between the General Assembly and the municipalities.

73.     Plaintiffs have suffered significant harm as a result of Defendants' actions, said actions having been carried out with the explicit intent to force Plaintiffs out of business without the legal authority to do so.

74.     Accordingly, Plaintiffs respectfully request that the Court declare that Defendants' actions have deprived Plaintiffs of their rights secured by the Rhode Island Constitution, and award damages to Plaintiffs in an amount to be proven at trial in excess of $10,000,000.00.

## COUNT IV

### Defendants' Targeted Action Against Plaintiffs
### Violates Plaintiffs' Fourteenth Amendment Rights As Applied to the States and Local Governments Through the Due Process Clause of the Fourteenth Amendment.

75.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 74 as if set forth in full herein.

76.     The Fourteenth Amendment to the United States Constitution provides: "No State shall…deny to any person within its jurisdiction the equal protection of laws." The Fourteenth Amendment's equal protection guarantees apply to the City as a political subdivision of the State of Rhode Island by incorporation through the Fourteenth Amendment to the United States Constitution.  The Defendants' targeted enforcement actions against Plaintiffs, cannot be justified under the Supreme Court's equal protection jurisprudence because the Defendants do not engage in this pattern and practice of conduct against any other similarly situated establishments within

the City of Providence.  This activity thus violates the Fourteenth Amendment to the United States Constitution, both facially and as applied to Plaintiffs.

77.    Plaintiffs have suffered significant harm as a result of Defendants' actions, said actions having been carried out with the explicit intent to force Plaintiffs out of business without the legal authority to do so.

78.    Accordingly, Plaintiffs respectfully request that the Court declare that the Defendants' actions violate the Fourteenth Amendment, and award damages to Plaintiffs in an amount to be proven at trial in excess of $10,000,000.00.

WHEREFORE, Plaintiffs, Lola's Rendezvous, Inc. f/k/a Silhouettes, Miami Employment Inc., The Pink Building, Inc., Steven Medeiros, and Shay DiPina demand judgment against Defendants, Providence Police Department, The Providence Board of Licenses, and The City of Providence in an amount no less than $10,000,000.00, plus interest, costs, punitive damages, counsel fees, and any other relief this Honorable Court deems just and proper.

Respectfully submitted,

Dated: November 17, 2022

/s/ Joseph P. Carnevale
Joseph P. Carnevale, Esq. (#9121)
Savage Law Partners, LLP
564 South Water Street
Providence, Rhode Island 02903
Tel: (401) 238-8500
Fax: (401) 648-6748
jcarnevale@savagelawpartners.com

*Attorney for Plaintiffs*
LOLA'S RENDEVOUS, INC. f/k/a
SILHOUETTES, MIAMI EMPLOYMENT
INC., THE PINK BUILDING, INC.,
STEVEN MEDEIROS, and SHAY DIPINA

12