## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| LOLA'S RENDEZVOUS, INC. f/k/a SILHOUETTES; MIAMI EMPLOYMENT INC.; THE PINK BUILDING, INC.; STEVEN MEDEIROS; and SHAY DIPINA, <br><br> Plaintiffs, <br><br> v. <br><br> PROVIDENCE POLICE DEPARTMENT; THE CITY OF PROVIDENCE; and PROVIDENCE BOARD OF LICENSES, <br><br> Defendants. | C.A. No. 1:22-cv-00416-MSM-PAS |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

The plaintiffs, Lola's Rendezvous, Inc., Miami Employment, Inc., The Pink Building, Inc., Steven Medeiros, and Shay DiPina (collectively, "Plaintiffs"), bring this action pursuant to 42 U.S.C. § 1983 and the Rhode Island Constitution, alleging unconstitutional enforcement actions. The defendants, the Providence Police Department, the City of Providence, and the Providence Board of Licenses' (collectively, "the City") now move for summary judgment. For the following reasons, the Court GRANTS the City's Motion for Summary Judgment. (ECF No. 24.)

# I.    BACKGROUND

The Plaintiffs operated the adult entertainment club known as Silhouettes at 245 Allens Avenue, "catering to a predominantly African American crowd" from March 4, 2021, until its closure in October 2022. (ECF No. 28-4 at 2, 5.) Silhouettes neighbored and was near other adult entertainment businesses in Providence. (ECF Nos. 25 ¶¶ 23–25; 28-7 at 3.)

Shay DiPina was the manager/promoter at Silhouettes, and he interacted regularly with the Providence Police Department ("Department") in that role. (ECF Nos. 1 at 3–6; 28-4 at 2, 7.) Among the Department's officers with whom Mr. DiPina interacted to relay complaints was Deputy Chief Verdi. (ECF No. 28-2 at 3.) During its operation of Silhouettes, Lola's had several encounters with the Department in the context of (1) COVID-19 regulations enforcement; (2) Police details; (3) Police presence and activities near and at Silhouettes; and (4) the Board of Licenses' license denial and related Department enforcement.

## A.  COVID-19 Regulations Enforcement

Soon after opening during the COVID-19 pandemic, on March 6, 2021, officers from the Department arrived at Silhouettes to ensure compliance with COVID-19 restrictions. (ECF No. 29-1 at 2.) Silhouettes was among several establishments inspected for hookah and COVID-19 regulation compliance. (ECF Nos. 24-9 at 2; 25 ¶ 12.) On March 6, Mr. DiPina spoke with officers in person and Deputy Chief Verdi by phone about capacity limitations and the use of hookah on the premises. (ECF Nos. 30 ¶¶ 27–29; 28-6 at 1.) Soon after speaking with Deputy Chief Verdi, the

2

officers left Silhouettes and declined to take formal enforcement action.[1]  (ECF No. 30 ¶¶ 27–29.)  A similar enforcement encounter relating to COVID-19 capacity limitations occurred on March 27, 2021.  (ECF Nos. 28 at 15; 28-1 at 2.)

### B. Police Details

In the first few months of business, Silhouettes requested police details from the Department on several occasions.  (ECF Nos. 25 ¶¶ 14–16; 28 at 17.)  During this period, the Department had difficulty filling police detail positions citywide, averaging approximately $1 million of unfilled details during consecutive years.  (ECF No. 25 ¶¶ 14–18.)  Although Silhouettes received several details during this period, after a breakdown in the relationship between Mr. DiPina and Department officers, as well as a lack of officers to work the shift ending at 4 a.m., detail requests largely went unfulfilled.  (ECF Nos. 25 ¶¶ 17–18; 28 at 17; 28-4 at 16–17; 28-6 at 2–3.)

### C.  Police Presence and Activities Near and at Silhouettes

The area in which Silhouettes is located is known to Department officers as a "high crime area."  (ECF No. 25 ¶ 21.)  Between March 2021 to October 2022, there were at least 73 police calls to 245 Allens Avenue (Silhouettes), as well as shootings, homicides, illegal weapons possession, car break-ins, and disturbances near the club.

---

[1] The parties disagree whether Silhouettes was "shut down," although the record reflects that Mr. DiPina acknowledged that the officers left after he spoke with Deputy Chief Verdi.  (ECF No. 29-5 at 7.)

(ECF No. 25 ¶¶ 22–23).[2]   Department officers were often present in this area, including at Silhouettes and at the parking lot behind the venue, which was used by patrons of several neighboring adult entertainment businesses like Wonderland, Mega-Plex, and The Bullpen.[3]   (ECF No. 25 ¶¶ 24–25.)   Department officers conducted stops and searches of some patrons and sometimes flashed their lights in the parking lot.   (ECF Nos. 28-4 at 11; 28-7 at 2.)   Silhouettes received two documented instances of potential entertainment license violations in May and October of 2022.  (ECF No. 28-6 at 4.)

### D. Board's License Denial and Related Department Enforcement

On May 12, 2022, Silhouettes applied to the Providence Board of Licenses for an entertainment license to host a musician known as Rowdy Rebel and were subsequently denied.  (ECF No. 25 ¶ 26.) Although Silhouettes asserts it did not plan for Rowdy Rebel to perform his music at the venue, he was featured on numerous advertisements and promotional materials.  (ECF No. 30 ¶ 31.)  Three other venues attempted to secure entertainment licenses for Rowdy Rebel but were similarly

---

[2] The Plaintiffs contest that the area was a high crime area by noting that there was not "a fight, a stabbing, a shooting, a murder" at Silhouettes.  (ECF No. 28 at 18.) But this contention misses the mark as the City does not claim that within the premises of Silhouettes was a high crime area but note, and Mr. DiPina acknowledges, that there were fights, shootings, and murders in the immediate vicinity of Silhouettes.  (ECF No. 24-2 at 68–88.)

[3] The Plaintiffs reference their Complaint to support their allegation of "over thirty (30) documented instances of the [the Department's] unlawful conduct" but fail to support this allegation in the record.  (ECF No. 28 at 19.)

denied because of the "proliferation of violence that's associated with this act." (ECF Nos. 25 ¶ 26; 28-4 at 23–26.)

Still, Rowdy Rebel attended Silhouettes at the advertised time and place set forth in the promotional materials. (ECF Nos. 28 at 23; 29-4 at 2–4.) Department officers arrived at Silhouettes to investigate Rowdy Rebel's appearance and are alleged to have shut the club down. (ECF Nos. 28 at 23; 28-9 at 6; 28-12 at 4–5.) Mr. DiPina's promoter's license was subsequently suspended by the Board for 30 days. (ECF No. 28-7 at 5.) Department officers had also appeared the previous day to investigate the appearance of a DJ at Silhouettes. (ECF No. 28 at 23.)

Deputy Chief Verdi and Mr. DiPina discussed the issues arising from the attendance of Rowdy Rebel and the entertainment license during a phone call. (ECF No. 28-12). In discussing the difficulties arising related to Silhouettes, Deputy Chief Verdi encouraged Mr. DiPina to sell the club, in part, because of the difficulties in ensuring public safety and the "stress," "frustration," and "aggravation" that its operations would cause the deputy chief. (ECF Nos. 28-12 at 5; 28-7 at 5.)

### E. This Suit

The Plaintiffs allege that because of the City's actions, it "suffered significant economic harm, including business closure, loss of rental income, and diminution in property value." (ECF No. 28 at 3.) The Plaintiffs bring this action under 42 U.S.C. § 1983, alleging that the City violated their rights under the First and Fourteenth Amendments to the United States Constitution as well as a claim under the Rhode

Island Constitution. (ECF No. 1.) The City now moves for summary judgment. (ECF No. 24.)

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmovant, and a dispute is "material" if it could affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of identifying the basis for its motion and the portions of the record showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the nonmovant bears the burden of proof at trial, the movant may satisfy its initial burden by showing an absence of evidence supporting the nonmovant's position. *Id.* at 322–23. Once that showing is made, the nonmovant must identify specific facts, supported by admissible and competent evidence, showing a genuine issue for trial.[4] Conclusory or self-serving assertions are insufficient. *Id.* at 322–24. Summary judgment is therefore appropriate where the nonmovant fails to make a sufficient evidentiary showing on an essential element of its case. *See Theidon v.*

---

[4] "Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990).

*Harvard Univ.*, 948 F.3d 477, 494 (1st Cir. 2020).  The evidence introduced into the record by the non-movant—here the Plaintiffs— "is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson*, 477 U.S. at 255.

### III.    DISCUSSION

The Plaintiffs did not submit a Statement of Disputed Facts as required by DRI LR Cv 56 and rely at times on the facts asserted in their Complaint. *See e.g.*, ECF Nos. 28 at 19; 28-2 at 2–4.  But "[p]leadings, such as complaints . . . are not 'evidence' and thus cannot properly support any purported fact used to oppose summary judgment." *Gerffert Co., Inc. v. William J. Hirten Co., LLC*, No. CA 10-101 S, 2010 WL 11693557, at *2 (D.R.I. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Even so, the Court reviewed and considered the exhibits produced by Plaintiffs in their response and all justifiable inferences of properly supported and cited material facts have been drawn in its favor.  All properly supported portions of the City's Statement of Undisputed Facts that are not contravened by the Plaintiffs' exhibits are deemed admitted.

### A.    Standing

The City argues that plaintiffs, The Pink Building, Inc. and Shay DiPina, lack Article III standing because neither alleged a cognizable constitutional injury and any asserted losses are either derivative of the business or contractual in nature.  The Court disagrees.

To establish standing, a plaintiff must demonstrate (1) a concrete and particularized injury in fact, (2) fairly traceable to the challenged conduct, and (3)

likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992); *Elizabeth Cady Stanton Trust v. Neronha*, 691 F. Supp. 3d 432, 438 (D.R.I. 2023).

The Pink Building alleges economic losses, including unpaid rent and diminution in property value, following the City's challenged enforcement actions. Economic harm constitutes a concrete injury under Article III. *Lujan*, 504 U.S. at 560; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016). Accepting the Plaintiffs' allegations as true for now, the stated losses are fairly traceable to enforcement actions that purportedly rendered its tenant unable to operate. Traceability does not require contractual privity, only causal connection. *Lujan*, 504 U.S. at 560. Because damages could redress the alleged harm, the Pink Building has standing.

Mr. DiPina alleges that he suffered personal financial loss in the form of performance-based compensation tied to the business' profitability. Lost economic opportunity constitutes a concrete injury in fact. *Lujan*, 504 U.S. at 560; *Spokeo*, 578 U.S. at 339–40. Although the City characterizes him as merely an employee of Silhouettes, ownership is not required for standing. The relevant inquiry is whether he personally suffered a concrete and particularized injury fairly traceable to the challenged conduct. *Elizabeth Cady Stanton Trust*, 691 F. Supp. 3d at 438. Construed in the Plaintiffs' favor, the record supports that conclusion.

Accordingly, the City's motion for summary judgment on standing grounds as to The Pink Building, Inc. and Shay DiPina is DENIED.

### B.     Counts II and III: § 1983 and State Constitutional Claims

In Count II of their Complaint, the Plaintiffs assert a general claim under 42 U.S.C. § 1983.  The City argues that this claim should fail as a matter of law because it is duplicative of Counts I and IV which specifically assert constitutional violations under the First and Fourteenth Amendments.  The Plaintiffs do not oppose summary judgment as to Count II to the extent it is deemed duplicative of Counts I and IV. The Plaintiffs also do not defend their unspecified state constitutional claim in Count III.  Therefore, the City's Motion for Summary Judgment on Counts II and III is GRANTED.

### C.     Counts I and IV: First and Fourteenth Amendment Claims

This Court proceeds to evaluate the Plaintiffs' § 1983 claims in Count I (First Amendment) and Count IV (Fourteenth Amendment).  To prevail in a § 1983 claim, a plaintiff must produce evidence that defendants (1) acted "under color of state law" and (2) deprived plaintiff of rights secured by the Constitution.  *Cepero–Rivera v. Fagundo*, 414 F.3d 124, 129 (1st Cir. 2005).  Here, the City does not dispute Plaintiffs' assertion that the municipal entities acted under color of state law and that freedom from racial discrimination and freedom of speech are protected rights, although they dispute that the Plaintiffs have been deprived of those rights.

The City raises two threshold issues, including state exhaustion and personhood under § 1983, which the Court considers first.

### 1. State Exhaustion and § 1983

The City contends that, in contravention of R.I. Gen. Laws § 45-15-5, the Plaintiffs failed to name the City Treasurer as a defendant and to file a claim with the City Council before bringing suit. (ECF No. 24-1 at 3 n.1.) But a § 1983 plaintiff need not comply with state presentment or exhaustion requirements before suing in federal court. R.I. Gen. Laws § 45-15-5 governs only state law actions for damages, not claims brought under § 1983 claim. *Nuey v. City of Cranston*, 524 F. Supp. 3d 1, 4 (D.R.I. 2021) (citing *Perez v. Town of N. Providence*, 256 F. Supp. 3d 139, 146 (D.R.I. 2017)). Accordingly, the Plaintiffs were not required to present a claim to the City Council or name the City Treasurer before bringing this action for alleged violations of their constitutional rights.

### 2. The Providence Police Department as a "Person" Under § 1983

The Plaintiffs' remaining § 1983 claims asserting violations of their First and Fourteenth Amendment rights must meet the prerequisites for municipal liability, including the requirement that § 1983 claims can only be asserted against "persons." "Persons" include municipal entities like the City of Providence, but not subdivisions like the Providence Police Department. *Irizarry v. Providence Dep't of Pub. Safety*, No. 1:21-CV-00081-MSM-LDA, 2021 WL 5040239, at *1 (D.R.I. Oct. 28, 2021) (collecting cases); *Boudreau v. Petit*, No. CV 17-301WES, 2024 WL 5202023, at *1 n.2 (D.R.I. Dec. 23, 2024); *Ligeri v. Rhode Island*, No. CA 07-207 ML, 2007 WL 3072061, at *5 (D.R.I. Oct. 19, 2007) (collecting cases). The Department cannot be held liable for the Plaintiffs' § 1983 claims as it does not qualify as a person, but the City of

10

Providence can be held liable for the constitutional violations of the Department. Summary judgment is appropriate for the Department since no other claims remain against it.

### 3.  The Board of Licenses as a "Person" Under § 1983

The Board of Licenses is situated differently from the Department.  "Under 42 U.S.C. § 1983, a municipality is liable for harms caused by its employees when 'execution of a government[ ] policy or custom ... inflicts the injury.'"  *Kurland v. City of Providence by & through Lombardi*, 711 F. Supp. 3d 57, 78 (D.R.I. 2024) (citing *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978).  Municipal liability may attach where the decision maker possesses final authority to set policy with respect to the action ordered.  *D'Ambra v. City of Providence*, No. CA 11-600M, 2012 WL 7220581, at *6 (D.R.I. Dec. 26, 2012) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (plurality op.)).  "[E]ven a single decision of limited scope and no precedential effect may constitute a *Monell* policy or custom if the official making the decision 'possesses final authority to establish municipal policy with respect to the action ordered.'"  *Quarterman v. City of Springfield*, 716 F. Supp. 2d 67, 76 (D. Mass. 2009) (quoting *Pembaur*, 475 U.S. at 481 (1986)).

This Court has held that the Board of Licenses may be a "final decisionmaker" for permitting decisions the Board takes in relation to adult entertainment venues.  *D'Ambra*, 2012 WL 7220581, at *7–8; *Saints & Sinners v. City of Providence*, 172 F. Supp. 2d 348, 349 (D.R.I. 2001).  Here, the Plaintiffs claim that the Board's decision to deny a license to Rowdy Rebel was part of the City's custom of discrimination.

11

(ECF No. 28 at 22.)  As the final decision maker for a permit, the Board may be held liable as a person under § 1983 if their decision violated the Fourteenth Amendment.

### 4. Count IV: Equal Protection

The Plaintiffs assert that the City's enforcement actions violate the Equal Protection Clause of the Fourteenth Amendment because they do not "engage in this pattern and practice of conduct against any other similarly situated establishments within the City of Providence."  (ECF No.  1 at 11.)  The City moves for summary judgment, arguing that the Plaintiffs have failed to establish that Silhouettes was treated differently from other similarly situated entities, on the basis of the race of its clientele or otherwise.  (ECF No. 24-1 at 9.)

The Plaintiffs appear to make a "class of one" claim in their Complaint, but the focus in their response to the instant Motion emphasizes alleged racial discrimination.  (ECF No. 28 at 13, 24–25.)  Under either theory, however, the Plaintiffs fail to make the required prima facie showing.

### i.    Class-of-One Theory

A class-of-one equal protection claim requires proof that the plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Buchanan v. Maine*, 469 F.3d 158, 177 (1st Cir. 2006); *see also D'Ambra*, 2012 WL 7220581, at *12–13 (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564–65 (2000)).  The plaintiff bears the burden of showing that the proposed comparators are similarly situated in all respects relevant to the challenged government action and must identify specific instances in

which such comparators were treated more favorably. *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 639–40 (1st Cir. 2013).

The Plaintiffs identify no comparator evidence from which a jury could conclude that Silhouettes was intentionally treated differently than other similarly situated establishments, or that even if they were treated differently, the City had no rational basis for doing so. The conduct the Plaintiffs characterize as selective enforcement occurred between March 2021 and October 2022 and includes enforcement of COVID-19 regulations, police detail issues, police presence in and around the premises, and licensing decisions by the Board. None of this evidence demonstrates that Silhouettes was singled out for treatment that was materially different from that imposed on comparable venues.

To the contrary, the record reflects that the City broadly enforced public safety and licensing regulations across the City. (ECF Nos. 24-9 at 2; 25 ¶ 12; 28 at 15.) Evidence in the record shows widespread COVID-19 enforcement at entertainment venues, extensive unfulfilled police detail requests citywide, and police activity in a high-crime area encompassing multiple adult entertainment establishments. (ECF Nos. 25 ¶¶ 14–25; 28 at 17.) Similarly, the Board denied entertainment licenses for the same performer (Rowdy Rebel) to multiple venues based on public-safety concerns. (ECF No. 25 ¶ 26.)

Further, the Plaintiffs' claim that the police activity near Silhouettes was "not replicated at neighboring venues" and that it was "uniquely subjected to this type of police presence" ignores the practical reality that neighboring venues share the same

13

streets and parking lot and that police presence on Allens Avenue, Bay Street, Poe Street, or in the parking lot would almost certainly "subject" those venues to the same police presence.  Perhaps most importantly, the Plaintiffs have not proffered evidence showing that these venues were similar in relevant respect beyond broad assertions of target clientele.  Nor did they produce evidence supporting their contention that Silhouettes was in fact treated differently than the other venues.  The Plaintiffs have pointed to no facts that would support a finding that the venues in question had similarities in characteristics such as area crime, clientele, size, or their interactions with the Department.  The record also contains no evidence of enforcement actions considered or taken against these venues for violations of either licensing requirements or City regulations.[5]

Because the Plaintiffs have not identified similarly situated comparators or shown irrational or arbitrary treatment, its class-of-one Equal Protection claim fails as a matter of law.

### ii.    Racial Discrimination Theory

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  Proof of racially discriminatory intent or purpose is required to establish an Equal Protection violation.  *Vill. of Arlington*

---

[5] The Plaintiffs' claim of being uniquely subjected to constitutional violations by the alleged police conduct is further undermined in part by the fact that Mega-Plex, also owned by Mr. Medeiros, is separately alleging that the police discriminated against it (on the basis of sexual orientation.) *See Spur Track Properties, LLC et al. v. City of Providence et al.*, C.A. No.: 1:24-cv-00010.

14

*Heights*, 429 U.S. at 265.  To prevail, a plaintiff must establish "(1) that he was selected for adverse treatment compared with others similarly situated, and (2) that the selection for adverse treatment was based on his race." *Rios-Colon v. Toledo-Davila*, 641 F.3d 1, 4 (1st Cir. 2011) (citations omitted).  The similarly situated standard is less demanding here than in a class-of-one claim.  The question here is "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001).

Even under the less demanding standard applicable to racial discrimination claims, the Plaintiffs have failed to present evidence from which a reasonable jury could infer discriminatory intent.  First, the Plaintiffs have not pointed to any direct evidence of racial animus.  Second, the circumstantial evidence, viewed in the light most favorable to the Plaintiffs, does not create a "convincing mosaic" from which discriminatory intent could be inferred.  *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citations omitted). Even if the Plaintiffs could establish that they constitute a protected class because they cater to a particular racial community, (ECF No. 28 at 14), the Plaintiffs have proffered no evidence, direct or circumstantial, from which a finder of fact can infer that the City targeted Silhouettes because of the race of their clientele.[6]

---

[6] Plaintiffs question whether Department officers properly received anti-bias training by pointing to testimony of officers who could not recall if they had received the training to support its argument of "discriminatory and targeted enforcement against Silhouettes." (ECF No. 28 at 20–21.)  The undisputed record sufficiently reflects that

The Plaintiffs point primarily at Deputy Chief Verdi's expressed opposition to Silhouettes' business model and his view that the club's operations would cause stress and frustration to support their discriminatory intent argument. (ECF No. 28 at 24–26.) But there is no evidence connecting these views to racial animus or that demonstrates a connection of these views to a campaign of targeted enforcement based on the race of Silhouettes' clientele. Indeed, the record reflects that Deputy Chief Verdi directed officers to cease COVID-19 enforcement at Silhouettes when contacted and worked with Silhouettes' management to promote compliance. (ECF Nos. 28-7 at 5; 28-12 at 5; 30 ¶¶ 27–29.)

The Plaintiffs also rely on the Board's denial of an entertainment license for a performance by Rowdy Rebel to support their allegation of discrimination. The undisputed record shows, however, that the Board denied license requests for the same performer at several venues for identical public-safety reasons. (ECF No. 25 ¶ 26.) Silhouettes' decision to proceed with hosting the performer without a license, and the Department's subsequent enforcement action, does not support an inference of discriminatory intent.

Because the Plaintiffs have failed to provide evidence of differential treatment among similarly situated establishments or to produce evidence of racially discriminatory intent, the City is entitled to summary judgment on Count IV.

---

officers did receive anti-bias training. (ECF No. 29 at 8–9.) Plaintiffs do not provide other evidence in support of a failure to train claim.

### D.    Count I: First Amendment Retaliation

The Plaintiffs allege that the City "targeted enforcement actions against" it to "force Plaintiffs out of business" as retaliation. (ECF Nos. 1 at 9; 28 at 26.) Plaintiffs point to (1) Deputy Chief Verdi's "expressed direct opposition to Silhouettes' business model"; (2) Police details; (3) Police presence and activities near and at Silhouettes; and (4) the Board of Licenses' license denial to support their claims. (ECF No. 28 at 25–26.) The City contends that, even assuming their activity regulates or impacts speech rather than conduct, the regulations are content neutral and are therefore subject to intermediate scrutiny which they contend is easily met by their compelling interest in public safety. (ECF No. 24-1 at 19–20.) The Plaintiffs argue that the City's conduct was not content neutral, nor narrowly tailored, and implicitly argue that the Court must apply a strict scrutiny standard. Because Count I of the Complaint only alleges the City's "targeted enforcement actions" violated the First Amendment, this Court will focus on those enforcement actions.

To begin, the Plaintiffs' First Amendment argument is devoid of any citations to the record to show that there is a genuine issue for trial. *See* ECF No. 28 at 25–26. The failure to provide any references in the record or point to any admissible evidence confirms that there is no genuine dispute of material fact and summary judgment is appropriate.

The Plaintiffs correctly state that adult entertainment is protected by the First Amendment and that states may impose reasonable time, place, and manner restrictions on protected speech that are content neutral, narrowly tailored and

17

provide alternative channels for communication of the information. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66 (1991); *D'Ambra,* 21 F. Supp. 2d at 113. Plaintiffs assert that the City opposed their "business model" and that, although Silhouettes was "not prohibited from offering exotic dances," the City's enforcement actions had the effect of suppressing "expression through pretextual or retaliatory means." (ECF No. 28 at 26–27.)

The Plaintiffs base their argument on the findings in *The Baltimore Sun Co. v. Ehrlich*, where the United States Court of Appeals for the Fourth Circuit held that government officials may not retaliate against protected activity by conduct that would chill or adversely affect it. 437 F.3d 410, 416 (4th Cir. 2006). There, the Governor of Maryland directed his press office to not communicate with two journalists he perceived to be unfair. The Governor did not dispute that his office issued the directive in response to the journalists' perceived failure "to be objective in their reporting." *Id.* at 417. The court concluded that the directive imposed, at most, a *de minimis* burden on the reporters' First Amendment rights and that the Governor's verbal criticism, though "hostile to and in open disagreement" with reporters' activities, was not retaliatory. *Id.* at 419–20.

Here, the Plaintiffs have not specified what protected speech caused the alleged retaliation by the City and how the retaliation they cite was connected to that speech. Instead, they allege unspecified discrimination and separately argue that "adult entertainment establishments—particularly those that cater to African American communities or promote culturally Black music and performers—would

18

reasonably fear the same targeted enforcement and retaliatory treatment." (ECF No. 28 at 25, 27.) But the record is missing any reference to other adult entertainment establishments fearing "targeted enforcement and retaliatory treatment" and Mr. DiPina acknowledged that other entertainment venues that catered to a similar clientele operated without fear of racial discrimination or targeting. (ECF No. 28-4 at 9, 24–25) (alleging other promoters had "carte blanche.") Such broad and conclusory statements, unaccompanied by record support, are not sufficient to show that there remains a material dispute.

The Plaintiffs next contend that Deputy Chief Verdi's "expressed direct opposition to Silhouettes' business model" was the "predicate for a sustained campaign of state action that culminated in Silhouettes' closure." (ECF No. 28 at 27.) Even assuming Deputy Chief Verdi is a public official, "[a] public official's malicious intent, taken alone, cannot amount to a retaliatory response." *Goldstein v. Galvin*, 719 F.3d 16, 31 (1st Cir. 2013) (quoting *Baltimore Sun*, 437 F.3d at 420.) Nor does the record demonstrate that Deputy Chief Verdi's comments translated into retaliatory conduct directed at Silhouettes' expressive activity. The evidence instead reflects content neutral public safety enforcement that was broadly applied to entertainment venues across the city; not a targeted retaliatory campaign waged against exotic dancing.

The Plaintiffs remaining contentions amount to an argument that because the Department's enforcement actions contributed to the closure of Silhouettes, the City chilled its speech. (ECF No. 28 at 27.) If every content neutral enforcement activity

19

that burdened expressive activity and that led directly or indirectly to the closure of a business or its inability to pay rent constituted a violation of the First Amendment, the First Amendment would completely hamstring the constitutional policing powers of states and municipalities.  Here, the City has clearly articulated a compelling interest in public safety and Plaintiffs' unsubstantiated assertions that the City's restrictions were not narrowly tailored fail as a matter of law.

The Plaintiffs have failed to articulate a viable First Amendment claim that is supported by the record and that there is a genuine dispute as to any material fact. Therefore, summary judgment must be granted.

## IV.    CONCLUSION

For all these reasons, the City's Motion for Summary Judgment (ECF No. 24) is GRANTED.

IT IS SO ORDERED.

Mary S. McElroy,
United States District Judge

March 30, 2026

20